May it please the Court, my name is Zachary Morazzini. I'm a Deputy Attorney General appearing on behalf of Appellants Governor Schwarzenegger and as well as Attorney General Brown. I'm not sure if I would like to reserve five minutes for rebuttal. Whatever you have left on the clock is yours to do with as you please. Thank you. The judge could just in a bravado just give it away. The judgment entered by the court below permanently enjoining enforcement of California's violent video game law should be reversed for four primary reasons. First, the district court erred by refusing to apply the variable obscenity standard set forth in Ginsburg v. State of New York when reviewing the constitutionality of the law. That's really at the heart of what you're talking about. Aren't you asking this court to go where no one has gone before and everyone that's tried to take a court there has failed? Yes, Your Honor, we are. So you want us to be the Ninth Circuit and go boldly into outlier territory that we're so famous for? Well, we're asking this court to basically recognize that this irrational dichotomy between sexually explicit material and violent material really has no place in First Amendment law. The U.S. Supreme Court in Winners v. State of New York, we read, left the door wide open for this. In that case, the Supreme Court was reviewing the constitutionality of New York's law which prohibited the distribution of violent material. Importantly, although the court struck down the law, it did so on vagueness grounds. But it was very clear when it recognized that it was not holding that states may not restrict the distribution of such material, only that when it does so, it must do so with precision. And the State of California has done so with its violent video game law. It has crafted a definition of violent video games which explicitly mirrors the prevailing standard for obscenity across the nation. Games which are so violent that they are patently offensive to community standards appeal to a deviant or morbid interest in minors and lack any serious literary, artistic, or political value. You gave us the sort of the compilation and admittedly they were disgusting, but aren't you just trying to be the thought police? Not at all. We're not concerned with controlling the thoughts of minors. The State of California is concerned that the parents make the choice. The U.S. Supreme Court in Roper v. Simmons, we think brilliantly outlined based on social science from around the country and from around the nation that minors under the age of 18 are statistically more likely to engage in reckless behavior. They lack the maturity, the judgment, and experience with their own self-control to be trusted to make important decisions to their physical and psychological well-being. What California has attempted to do is not to shield the minors from anything, but ensure that parents, through the force of a state law, are aware and assist their children in these considered decisions that they must make. Decisions, which substantial evidence shows, can have detrimental impacts on the physical and psychological well-being of these minors. Just so that we can cabin your argument, I think you started out with, have you abandoned your argument that in the interest of preventing violent, aggressive, and antisocial behavior? I don't believe we ever raised that argument, Your Honor. The interest expressed by the That's one of the It's gone now. Preventing antisocial, I'm sorry, I thought Your Honor was referencing whether or not we're trying to prevent unlawful violent acts in the future by these kids. That wasn't expressly the interest the legislature was seeking to promote. It was the aggressive thoughts, aggressive cognition, automatic aggressiveness, desensitization to violence, decreases in pro-social or helping behaviors. Those are the interests the state of California is interested in assisting parents protecting of their children. Because they can't do it well enough? It's best if the parents have the force of law behind them. These purported suggestions, so-called self-regulations of the industry, certainly are not better at doing this. In fact, the industry could today determine they no longer want to rate their own video games and no longer want to have parental controls in the new gaming consoles. Well, I thought you were limiting your compelling state interest to preventing psychological and neurological harm to minors. And that's what I described, at least attempted to describe, Your Honor, aggressive cognition, automatic aggressiveness. That is intrinsically harmful to children based on the social science we, the legislature, was presented with. So that is a physical and psychological harm in and of itself by definition. So what's the principal difference between a video game and a violent book? I mean, you read the Iliad and Homer's Iliad, and that's pretty violent. If they turned it into a video game, it would fall within your definition. Actually, it would fall within the safe harbor, we believe, Your Honor. That's the beauty of applying the obscenity standard. If the material has serious literary, artistic or political value, it will be exempt from California's law. Now, all these games, I mean, interestingly, all these games have a storyline of sorts. I wouldn't be so sure, Your Honor, though I think based on our video, our physical exhibit in the records, some of these games may lack a storyline. But it's not just a storyline The storyline has to be sufficient to to render the extreme violence in the game less harmful. It has to be such that it overpowers the violent material, which is the same with obscenity. Your example, if you took the Iliad and just said, well, we're going to reenact the battle scenes from the Iliad in a video game. I don't think you'd find much of a difference between that and some of the violent video games that you see here in terms of the violence. And so what's the principal difference? Well, I believe if you took the Iliad and perhaps took the battle scenes out of it, it would no longer be great literature, Your Honor, perhaps. So the fundamental difference is there's an interactive nature in video games well beyond that of reading books or watching movies. It's engaging. It's participant based. It's the actual minor, the child that is going about being rewarded for inflicting this senseless violence in these video games. And I think in the record, we we cited studies that that distinguish video games from this unique medium of expression from all others. But at the end of the day, basically, you're saying the parents are not competent to make those judgments on their own. Not at all, Your Honor. We're saying that parents are entitled to the assistance through the force of a law to ensure that this decision isn't left in the hands of their children and retail store clerks. So what? But then parents could still go buy it and give it to their kids, right? Of course they could, Your Honor. So if so, why don't we just go a little bit further and make sure the parents can't buy it, too, because they would. We don't want we don't want psychological harm inflicted on any children. They're under 18. They're vulnerable. And isn't that part of, you know, the whole why we limit sexually explicit. So let's just take it the next step. If we if we allow you this. Why? You know, let's let's go. Let's go the whole way. I believe for the same reason that sexually explicit material is the same. Parents are entitled to expose their children to what they determine to be a healthy dose of sexually explicit material under our obscenity laws. There should be no logical reason to have it any different with violent content and violent material, especially in the unique format of interactive violent video games. Under the variable obscenity standard, which we believe should logically apply to this case, that the California's violent video game law undoubtedly survives judicial review because it was not irrational for the legislature to determine that these games can be harmful to the physical and psychological well-being of minors. Is there anything off limits to the legislature to to prohibit to minus? I mean, you've got you've got violence, right? And presumably they could do the same for sex on a Ginsburg. Right. Yes. What have they decided that having games where people eat unhealthy foods and get fat or books? Well, let's just talk about games. What have you said? You know, it's unhealthy for children to play games where they engage in unhealthy eating habits. I think if you don't think that that that would be within its right that they provide the right kind of they show that I kind of research supporting that, that that would also be be within the legislature's discretion. Your Honor, as we noted in our briefing, one noted legal scholar, Kevin Saunders, he traced back the traditional understanding of obscenity, which is the treatment of human beings in a purely physical way that has great spiritual or emotional impact on the viewer in a manner that is either sexually explicit or violent. So keeping this this the materials that issue to sex and violence makes perfect sense and comports with the traditional understanding of obscenity law. We don't see any need to take it into. You have two arguments on this issue. One of them is that this is obscenity broadly construed. But you also make the argument that this is just bad, even if we don't buy into the idea that this is obscenity. And this is what I was pursuing. And so I'm asking you, you know, what about the fat game? Is that something that the legislature, in your judgment, could, you know, just say, you know, they pick up these bad habits and they are if it's unhealthy. Yeah. Yeah. I'm going to push you harder after this one because I'm going to give you the game where they are environmentally irresponsible and drive big cars. OK. And show the subway and stuff like that. Well, I think if we stick to the use plastic bags, what I mean, what about that? Well, what about games like that? That's a teach children bad living habits that make them irresponsible citizens and lazy. And so could the legislature say, no, we really want to make sure that they can buy them. The legislature need under Turner Broadcasting System versus FCC. The legislature has to draw a reasonable. Let's let's let's do this. How about if I ask you a question and you answer yes or no, and then you explain because I am still waiting for the end of your long explanation to my. So let's just say yes. No. And then you can tell me you can explain anyway you want to. So let's start with a bad eating game in a game where they there they are in the kitchen making unhealthy food, you know, eggs and, you know, and, you know, the rest of the slaughtering animals for food, you know, that kind of thing. And the legislature says that's bad for children and teaches them bad habits, says tissues and disrespect for for non-human life. We want to ban that. OK. Can I look? Can I do it? Probably no. Your honor. Why not? Because that doesn't appear to me. I could be mistaken with your hypothetical that there is any any any harm to the children, any any psychological go up and be fat and get serious sclerosis. And, you know, they get bad. They learn from these video games to live in ways that are unhealthy for them, that shortens their lives. How about smoking games where characters smoke cigarettes or other things? No, because it's not the playing of the game itself which causes the harm. It's the going out and smoking. That would be like. Well, but the same is true of the violence. It's not that it's not the playing of the game. I believe it is the playing of the game. That substantial evidence shows it's the playing of the game, which results in the increased cardiovascular arousal, which desensitizes the children to violence. It's the game itself which is inflicting the psychological harm. And your honor's hypotheticals, it's not the playing. I think so. It's not the fact that they might go out and do it. It's the fact that they get all excited. Exactly. They it increases. I thought the rationale was that, you know, by teaching violence and disrespect for human life and, you know, you can split people in two with that. They are likely to go up. It could be kind of human beings actually go out and do that. That's not the right. That's what distinguishes California's purported interest that we've put forth through the beginning of this of this proceeding. Your honors, we're not seeking to prevent children from going out and do violent acts, though that would be a wonderful secondary effect. It truly is the state's attempt to help parents protect the immediate physical and psychological well-being of the children. And that's the evidence that the legislature was in the record. So if they if they get an expert who says playing Sim City gets people all excited and, you know, they get all sort of frenzy even playing the video game, they could ban that. I don't believe so, your honor, because the state has expressly attempted to restrict material which they believe meets the definition of obscenity. However, taking a sexual material and replacing it with violent material under the theory that there is no reason to maintain this dichotomy in First Amendment jurisprudence, that sexual material is somehow more harmful to children than extremely violent material. There's no because of sanity if so long as it meets the definition of obscenity, which traditionally has been understood to be the treatment of human beings in a physical manner, either sexually or violently. Only those two. And I don't believe that a Sim City game would come anywhere near meeting the definition of obscenity, either violent, obscenely violent or obscenely sexual. So your argument then hinges on our buying into the notion that obscenity includes violence. I believe the US Supreme Court has left that door wide open and it's a logical extension, not just logical, perhaps compelled by everyday life. There's the plaintiffs. The video game industry has presented no evidence whatsoever that sexually sexual, sexually explicit material is somehow more harmful than the extreme violent material contained in these disgusting video games that we submitted in our physical exhibit. Right. But you did. You had, I think, some 700 pages of testimony or whatever in terms of it. You had one specific doctor that wrote most of the articles. He wrote some of them. And well, a large percentage, a large percentage. Correct. And I think other courts have not have discounted this doctor's evidences, not not really that not being correlational and having methods, methodological flaws. Correct. Actually, some courts have choose to not accept it as meeting their heightened standard of proof in the Eighth Circuit. Specifically, I believe it's the St. Louis case. The court mandated direct causal empirical proof. And that's simply not supported by US Supreme Court precedent. Your honors. I think the most analogous precedent is Turner Broadcasting System versus FCC, wherein the court said it must be upheld so long as the legislature drew reasonable inferences from the evidence submitted before them, which is absolutely what the California legislature did in this case. But your honor brought up the record. Dr. Williams saying, OK, let's assume that that we don't buy your argument on Ginsburg. We don't make that extension. It would be your position then that the that the evidence that was before the legislature supports a compelling state interest. Absolutely. Your honor. If you look at Dr. Williams, the testimony submitted by the plaintiffs here, if you look at the testimony of Dr. Williams, he conceded that co-variation exists between exposure to violent video games and increased aggression, all comporting with Dr. Anderson's general aggression model, which, by the way, Dr. Williams testified. Mr. Dr. Anderson is the expert in the field and his work. You're talking about aggression. You mean like to go on and act aggressive, internal, aggressive, aggressive cognition, having an immediately aggressive response to an outside stimulus, not going out and and breaking the law necessarily, but perhaps going out and beating your fist against a cinder block. Well, this is internally and intrinsically harmful to the kids that play him. But regardless, if we recognize going to court makes me feel that way. That's understandable. Sometimes you just heard about lockdown. So that's true. But even Dr. Williams testimony, he never testified that there is absolutely no causal connection between playing violent video games and these increased aggression and violence. He just testified that personally, he wasn't convinced that other alternative theories couldn't be ruled out yet. And that's a far cry. If we look back at the evidence required in Ginsburg, the Supreme Court expressly noted that, quote, development. But the growing consensus of commentators is that while the studies agree that a causal link has not been demonstrated, they are equally agreed that a causal link has not been disproved either. And this is perhaps where we are with the stage of stage of social psychology in the state of California. With regard to the impacts of the first amendment. Doubts are usually resolved against the prohibition. It wasn't in Ginsburg, Your Honor. They deferred to the legislature. Mosnick. Well, this is the case involving the movie screen or the movie screen. And they said, oh, the children might view the new pictures. The Supreme Court said, well, could be new pictures of a baby could be new pictures of tribes. Sure. People work on that ordinance. Pardon me. That ordinance was fatally flawed because it didn't meet the standard, the prevailing definition of obscenity that's been required by the US Supreme Court. There was no safe harbor for nudity that had some serious artistic, political or educational value. They didn't say, well, kids catching and, you know, we're worried about children seeing the screen when they're not, you know, they don't have a sound. They don't have a full story. All they see is the naked picture. And the naked, you know, the naked picture is to make a picture. If you don't have the narrative, you don't know what's going on. And they didn't say, well, we want to be especially protective of children. And therefore we will. I mean, it was a very reasonable requirement. The other space said, you know, don't don't show your outdoor pictures in a way that the naked bodies can be seen from the street. Right. Naked bodies aren't necessarily obscene unless they meet the prevailing definition. In this case, it would be the Ginsburg definition, which would be variable, variably obscene or obscene as to minors. The ordinance at issue in Erosnick could have been saved, perhaps, if if the material that were prohibited from being displayed on drive in movie theaters were defined as obscene nudity. Your honor, I see that my time is run. OK, we'll hear from opposing counsel. Thank you. Good morning, Your Honor. Paul Smith for the Applebee's. Our position is that twofold. First of all, that the California video game statute does have to meet strict scrutiny of the First Amendment. And second, that the state hasn't come close to satisfying strict scrutiny with the evidence that is put forward here. Let me start first with the issue of whether or not they can get outside of the usual requirements of the First Amendment by invoking Ginsburg to support an ordinance that censors violent content as as as given to kids. I mean, these are some really disgusting videos. I have to say, they put a tape and it has a couple of videos and they pick the most lurid scenes they could possibly find. Interestingly, they didn't give you the storyline of those videos. And even though they passed a law that says you have to judge the video as a whole and it has a serious value component. And of course, they didn't bother to give you any of those. But it is probably true. They picked one or two most repellent videos. You could possibly find at least those scenes. The question, though, is, is violence as a category something we're going to allow the state to turn into an additional form of obscenity? And the state. But if the proof is the same as something for the sake of argument, that the proof is the same as was in Ginsburg in the obscenity cases. What's the principal difference between violence and what the court said in Ginsburg is we don't know what the answer is in terms of social science, but it doesn't matter because it's obscenity. They said that there was a claim that it wasn't said that obscenity as a term is defined for adults. This wasn't what happened in Ginsburg was the state had made a finding that this kind of material was harmful to children, a clear and present danger to our youth. The court then said it is very doubtful that this finding expresses an accepted scientific fact. But obscenity is not protected expression and may be suppressed without a showing of the circumstances which lie behind the phrase clear and present danger. So they went on to say, essentially, we are willing to relax the boundaries of obscenity to a small degree as long as it's sexually explicit material, because it's going to kids and we're not going to require in this narrow area any kind of showing of actual harm. We're going to presume harm. And basically, we all know the court said that sexually explicit material given to a five year old or a 10 year old carries with it the kinds of concerns that allow the state to regulate. But violence is very different. And I think Judge Posner's opinion in the AMA case is very important to look at on this. Unlike sexually explicit conduct, violence is a very much a part of childhood. It's something that's in fairy tales. It's something that's in childhood literature. It's something that's in dreams and fantasies and concerns of children all through those years. And so this is this is an area if you extend variable obscenity into violence, you're going to have to start drawing lines that have never been necessary under Ginsburg about which violence is sufficiently lurid or sufficiently grotesque. What was cert thought denied on that Posner case? Actually, I think cert was sought in that case. I'm not sure, your Honor. That was years ago. There's been about seven of them since. That's a little hard to remember, but I believe that's correct. But, but that that case is very instructive, I think. I think you'd really like to argue this case before the Supreme Court. Your Honor, I think. Why shouldn't we oblige you and create a nice split? You know, your Honor, I think. And that's why you, you know, you know, I'd be very happy to win this case here, your Honor. I think that might be just fine. I think with a felony cap, you will get if you win it in the Supreme Court. Yes. Well, isn't that tempting? I think I think I'd rather stay right here, your Honor, and talk to you about this problem. And nudity is a part of childhood, too. I mean, at least last time I changed the diaper and looked around. Right. Those are it's. But there's a difference between the normal nudity you might see as a child and obscenity. There's a difference between hitting your brother and maiming, as you would in these video games. There is a big difference. If you can prove the difference. What's what's the principal distinction? Well, let me get to the issue of whether they proved anything later, because I think it's very clear that the evidence here is extraordinarily. Yeah. But but with respect to this issue of sex and violence and whether or not it's a more tightly tabbed category, sexually explicit material, you know, under Ginsburg, it has to not just be nudity. It has to be nudity that appeals to a prurient interest in minors. And it has to have no value and that sort of thing. And that category is not perfect. Talk about girly magazines, you know, didn't didn't sound like terribly prurient to me. Well, certainly it was prurient, girly magazines. It wasn't just some sort of National Geographic magazine. But they're trying to stay in the same distinction in this case. They're saying, you know, normal violence is fine. You see that in cartoons or some of these games. When you when you start getting into these extreme forms of maiming and destruction, that's different. Well, they say that. But then they they've completely been unable in this case to tell you where that line is. We put in the in the evidence six games with much more extensive footage about what happens in those games. They're every bit as violent as those two games that they put in. And they have they've never been able to say where they're covered or not. No, I understand. As a matter of fact, you have an argument. It's a matter of law. I mean, what's what's the what's the reason we shouldn't extend the definition of obscenity to violence? Well, if it meets the standard and they prove it. Well, I think that the whole concept of obscenity, as the Supreme Court has outlined, it is focused on a particular distinctive aspects of sexual sexually explicit things being particularly different from everything else, particularly offensive as well as potentially harmful to minors. And if you start saying violence, is that then you've expanded the category far out the outside the bounds of what the Supreme Court had in mind. What's the what's the court in Miller versus California said when they sat down to say, here's what obscenity law is in 1972? They said state statutes designed to regulate obscene materials must be carefully limited. As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. Now, what the court understood was if we're going to let the legislatures decide other things or obscenity and just apply that label willy nilly, there's nowhere to stop. What if it's violence? What about the next game that shows you how to cheat in school or shows you some other bad behavior that they think would be harmful to children? So this is not a big deal. I mean, this is not a statute that says children can't play these games. They can't own them. It doesn't say that adults can't give them as gifts or their parents can't allow them to play in their homes. All it prohibits is a commercial transaction. This is at the point of sale, the point of commercial sale. The children, without being accompanied by a by adult, can't buy it. You know, it's sort of like the movies. It's sort of like going to the what they now call X-ray movies, NC-17. Nobody stops you if you bring your teenage kids to one of those movies. But if they want to go by themselves, they'll turn their way out the door. Well, you know, if you accept that justification, say this isn't really censorship of the 17 year old who wants to go buy this game, then there's then that opens up another can of worms, which is what is the next law going to say? Should we protect the power of parents to sanitize their kids expressive environment by saying you can't sell kids books about sex education or about politics? We can talk about that case. Now we're talking about this case. All it says is you've got to put the big 18 on some games, which will probably make it more attractive. You know, the kids will know exactly which ones to go for. And then they got to get their big brother or their uncle or maybe their mother or father or some stranger. They get five bucks to walk in the storeroom and buy a game for them. I don't see where this is a huge censorship thing. Well, the real problem is going to be the issue of line drawing is a major practical problem inside the principal problem, which I think is important under the First Amendment as a practical matter. If this law were to go into effect, the game manufacturers and the game sellers that I represent would have to figure out which of hundreds of games fall just over that line. I mean, you're applying this bizarre set of factors. I mean, it's the same factors as Ginsburg. But when you transmit to it, the movie people do it. They have a board and they come up with ratings and they managed to figure out which is which. And they usually do a pretty decent job of it, as best I can tell. I really haven't seen very many movies that I said, oh, boy, this is this is the wrong category. You know, I would note that all of that ratings structure is entirely voluntary, not required by law. And when states have tried to mandate it, I am aware of that. We're talking about the mechanics and how difficult it is. And I'm telling you, the regime where this is done, it doesn't seem to cause very many problems. So the question of, oh, boy, this is a big burden and this would be so difficult for my clients. You've got to say that because they are clients. But, you know, it doesn't fool us. It's a business. It's just like any other business. And if we say or the Congress says or the California legislature says, you know, you've got to have an additional safety thing on your on your consumer item. You go out and do it and then pass the cost on to the consumers. And that's just the way that's just the way business is done. No, Your Honor, the notion that there's any comparison at all between the task of identifying which movies and games are so pornographic that children shouldn't be allowed to go into them and the task that would apply here is to compare apples and oranges. How are we supposed to figure out apples and oranges all the time? Well, what's what's the problem with that? How are we supposed to figure out which portrayal of violence? Looking at the game as a whole is sufficiently deviant or morbid that it somehow falls over that line. And which game has literary value and which one doesn't have literary value? We're talking, after all, about games here. Well, OK, let's say they do it and they get it wrong. They don't get called off to jail. Right. I mean, they get a second chance to do it. It's not they get punished. You have a fine. A thousand dollars a sale. That's a lot. That's a lot of burden. So what's what the reality is going to be is you're going to have vast overmarking of these 18s on these games. And, you know, so anything that has anybody to get shot at, it's going to end up being censored in the state of California. The case is a little bit of different posture than it was before the district court in the sense that states concede conceded that part of the statute is not constitutional. Correct. Yeah, they came close to conceding it in the trial court. But that's essentially that the whole piece, the second definition is gone. Yes. And you're you're asking the court to say that they can't save the part under separability. Is that correct? That is our position, Your Honor. I think it's it's sufficiently clear that the first part is unconstitutionally. You probably don't have to get to that point. But we do think that as a matter of linguistics, it says either or. And given the importance that the second definition played in the legislative process, you could make an argument that they shouldn't be you shouldn't uphold the separability principles. Let me, if I could, take a minute to talk about this research, because I think given the huge volume of paper that you were all unfortunately given here, you might come away with the assumption there's some actual empirical basis for what the state legislature was concerned about here. You can look at that tape and that pieces that they selected out. It's pretty repellent. Postal two is the poster child for these things that they go around and they show people. But what does the research actually show? There are two kinds of studies that exist. One is experimental studies in which they show people they have them play a game for 15 minutes and then they do these tests in the next 15 or 20 minutes in which they do various tasks like push buttons and reaction time or they send a noise blast to some some person in the other room. And they find that to some incredibly small degree, some tiny amount more likely that they'll push the button longer or push it harder if they've been playing the violent game rather than the less violent game. Their argument that they're making to you, and maybe you can incorporate this in your response, is that that you're saying that they have to demonstrate a connection between playing violent video games and psychological harm that is akin to a scientific certainty. We never use the phrase scientific certainty. We said substantial evidence of causing something that the government has a business being concerned about. I think what they call psychological harm is just thought control. It's probably it is a nonstarter in the first place. What business is it of the state of California to decide that some expressive work otherwise fully protected under the First Amendment causes people to be more suspicious of outsiders or to be feel more aggressive when they're challenged? Do we really want the government deciding which works make people's personalities or their beliefs or their feelings get altered in a way that the state of California doesn't approve of? That's a very that's a very scary prospect. But let me finish this description of the research. So there's that one category. So how would you design the research? We wanted the way to do the research as the evidence in the record very clearly reflects. Dr. Anderson said there's a glaring gap in our research. We haven't done the logic longitudinal studies. And you do that over a period of years. You follow a cohort of people. You say, here's what you were like here. Here's what you received. And then at the end, you come out at the end. The one medium that has never been studied in that way is video games. Television has been studied that way out the wazoo. And Dr. Anderson would tell you the evidence on television is clearer than it is with respect to video games. And the effect sizes, he calls them effects, even though there's no actual cause proved, are just are just as large. But somehow the state of California has decided video games need to be attacked. And Judge White, I think, was correct to say, you just pick this one little category of games, not all the games, a few of the games. And you leave all the vast rest of the media untouched. What reason is there to think you're going to accomplish anything? Don't they claim that because it's interactive, that that puts it in a different category? They claim that. But the evidence they submitted is entirely devoid of one shred of evidence to support that. As Judge White said, every single study found effects comparable to the effects they found for passive media like television. And one of the things we have in this record for you is the cross-examination of Dr. Anderson, which I did in the Illinois trial. And he testified it's on pages 346 to 422 of the supplemental excerpts of record. And that's a very telling cross-examination because he conceded that there's not one bit of evidence that video games are because of their interactivity. One bit worse than television. And he conceded that the graphic and lurid games that are targeted here are not any worse than the cartoonish games that are played by little children. He said kids are no more vulnerable than adults and that the effect sizes that he's finding and relying on are tiny, to the extent that they explain about four percent of the variation among people when they come out of these experiments. And he conceded the other kind of study, these correlation studies, where they say, here's a bunch of people. Here's a bunch of video game. What video games they play. Turns out that slightly more aggressive people slightly place more slightly more aggressive games at the same time. And he conceded that he doesn't know, can't really say whether it's the aggressive people choosing the more violent games and more violent games, making people more aggressive. But those are there. That's their entire evidence. These short term experiments where people are aroused for the next 20 minutes and these correlation studies. So what we have here is this entire enormous effort to go after this one industry target these games when the scientific basis of it. They pile up the studies, but they do the same thing over and over and over again. And they still haven't proved that there's anything significantly harmful about these these games. Certainly nothing that would begin to satisfy strict scrutiny under the First Amendment. Well, let's assume that, you know, that obviously in terms of Congress or legislatures, you know, have hearings. They listen to things and they're doing that. And, you know, we're supposed to give a certain amount of deference as far as that goes. Let's assume that you lose there. Then your next arrow in your quiver is the narrow tailoring. Can you narrow tailoring and the least restrictive alternative? Your Honor. All right. Can you explain that argument? There are two aspects of it. One is that the game, the law does not target the games that the research says are harmful. The research says, as I indicated just a minute ago, any game that has violence, even Sonic the Hedgehog, the games that are rated E are equally likely to cause the same ill effects. He uses the word effects fairly loosely, Dr. Anderson. And so there's there's a there's no fit between what they actually are regulating and the evidence they're supposedly relying on. Even more importantly, there's a less restrictive alternative argument, which is we have now not only this very detailed rating system on every game, but we have technology in the consoles that allows the parent to set the thing. The day is brought home from the store so that no game rated even M, let alone A.O., can be played by anybody on the game without a password. And what what Judge White correct me on the console, any use, any any game can't be played on that console. And so what Judge White said is this is a less restrictive alternative, which the state hasn't even tried and didn't even attempt to show is not workable. It's very much like the Playboy case in which Justice Kennedy said, you know, parents have a right to block these particular cable channels that have this particular problem of signal bleed. And until we try that less restrictive alternative, you can't just censor. And that's what the state went ahead and tried to do and said, we don't want to. We don't want to rely on parents to use these technological measures that solve this problem if there is one. And we don't want to rely on parents to supervise their children. We think we know better about what's good for kids. And then let me suppose is that the game will be played on the home console. It could be played at a friend's house. It could be played. The kid could buy his own console. The other kid will have his own games to your honor. If you're really worried about trying to protect the kid from somebody else's games, it's somebody else's house. There's only so much anybody can do at that point. No. I mean, if if if there's a rule that says that kids can't go out and buy the games themselves, there'll be certainly fewer available to them without some adult getting involved in saying it's OK to buy them. The record shows that 83 percent of these games are bought for minors by their parents. So the extent to which any of this will make a difference in terms of what 17 percent are bought by minors with other parents. That's right. Why can't the legislature be concerned about those 70 with 83 percent will be unaffected. Right. Right. I mean, you have this entire scheme and the 83 percent have no effect whatsoever. The 17 percent, though, will care. We weren't involved. We don't want the kids playing these games. And we're not there at the store. We don't know. We can probably get around everywhere. It'd be nice if the store didn't start on these games. But we're talking about strict scrutiny of the First Amendment where the state has very high burden of showing that it's tried every possible least restrictive alternative. You know, it's interesting. You try to look for a case in which strict scrutiny under the First Amendment has ever been found to have been satisfied. And the courts have allowed a content based restriction on speech like this one. And it's virtually a null set. This is this would be a very dramatic development to start saying, we're going to say this is fully protected speech. But we're simultaneously going to say that they have satisfied strict scrutiny. And I don't think this is the kind of record here to take a different view of the prohibition where against, you know, let's say determined that playing certain games, they get injuries to their thumbs because they hit the button too often. And so they ban, they prohibit buying on these games if they require frequent pushing of the button. Would you view that as different? Yeah. I mean, if it's not a content based distinction, if the line is based on the kinds of movements that you have to make with your thumb, regardless of the content of the game, and it has to do with a physical injury that is caused by those movements, I think that'd be a very different case. If you win, I'm saying hypothetically, if you were to prevail, say at the, that it's not narrowly tailored, do we have to deal with the labeling issue? Your Honor, I think if the prohibition on sale is held unconstitutional, Judge White was correct that the labeling issue falls automatically. It couldn't possibly be true that the state is barred from preventing the sale to people under 18, but still allowed to put a big two inch label on top of the game that suggests that somebody under 18 can't buy it if they still have a constitutional right to buy it. So I think the two are tied together and that there's no real reason to think he would uphold the latter without the former. But you have to get to that issue. Well, I think the state has defended it separately. Judge White didn't think there was any real issue there. I mean, I think there's really very little to say about it. You would argue that Blagojevich is correctly decided. Yes, sure. That labeling can be unconstitutional if it's forcing you to put on a on a product that's protected speech. This is a book. This is not this is not something just an object. They make you put a label on it to deter people from buying it who have a perfect right to buy it, especially if it covers up the label that actually gives you the information about what the contents of the game are. I don't think the state needs to be in the business of trying to do that. I see my time has expired. Your Honor, I appreciate the opportunity. OK, thank you. You didn't save any time for a bottle. If you'd like to take a minute, we'll give it to you. Chief Judge, what do you suggest? I suggest you take a bow. Thank you. Thank you, counsel. Cases are yours. Thank you for another very good argument. We are now adjourned.
judges: Kozinski, Thomas, Callahan